**PAISLEY et, Petition, In re.**

Public Utilities Commission.

No. 27094.   Decided May 24, 1960.

## FINDING AND ORDER

The Commission coming now to consider the above entitled matter upon the Application for Rehearing filed by Petitioners herein; the testimony adduced at a public hearing in the matter on July 24, 1959; the written Report of Attorney-Examiner C. Howard Johnson, dated February 15, 1960; the brief filed by Petitioner James O. Paisley, dated August 26, 1959, in support of the position of Petitioners; and being otherwise fully advised in the premises and in compliance with §4909.03 R. C., hereby renders the following opinion:

### RESUME OF THE RECORD:

The Commission hereby adopts as its own, as if fully rewritten herein, the "History of the Instant Case," the paragraph entitled "Compliance with Commission's Order" and the "Nature of the Instant Rehearing" as the same are contained in the written Report of the said Attorney-Examiner, dated February 15, 1960.

### COMMISSION DISCUSSION:

The instant complaint arises from the desire of Mr. James O. Paisley, et al, to secure telephone service from The Ohio Bell Telephone Company. Throughout this proceeding, Mr. Paisley has consistently reiterated his position that only The Ohio Bell Telephone Company could furnish him with telephone service designed to meet his communications requirements and the requirements of other citizens in his locale since the service offered by the General Telephone Company of Ohio would require the payment of not only flat monthly recurring rates but message toll telephone charges to the points most frequently called, if the telephone were utilized as an instrument of proper communication.

In Mr. Paisley's letter to the Commission of August 26, 1959, which is in the nature of a brief and summation of arguments supporting his position, Mr. Paisley states:

"One thing we would like to say is that in our original petition we asked that we be provided with the local calling service of the Wellsville Exchange of the Ohio Bell Telephone Company, and did not object to the territory in question being a common territory in which both the Ohio Bell Telephone Company and the General Telephone Company could serve. However, the formal papers from the Commission stated our case as asking to be removed from the operating area of the General Telephone Company and placed in the operating area of the Ohio Bell Telephone Company, which, of course, is what we do ask for if a common territory is not to be considered, or an agreement cannot be worked out between the two companies to provide us with adequate service.

Since there was no new evidence to introduce at the rehearing in addition to the evidence already to be found in the petition and exhibits previously presented by us, and in the communications from various outside sources, including the superintendent of schools, supporting our position, the discussion was confined almost entirely to the

attorneys, Mr. Bush and Mr. Griffith. On agreement of the attorneys as to the nature of the rehearing it appeared not to be in order for me to take part in the discussion, so I restrained myself with difficulty, and our case was presented by our attorney, Mr. Bush. My regret was that I could not interject the many points of evidence which occurred to me as I listened to the discussion, and could not refute some of the arguments advanced by Mr. Griffith of the General Telephone Company. However, even if I had been permitted freely to interrupt with my arguments and objections, I could not have added anything that I have not already said in our petition and in the letters I have written to the Commission from the beginning to the present time.

The granting to us of a rehearing of our case is an indication that the Commission is truly concerned that a rightful decision shall be arrived at in our case. The persistence we have shown in pursuing our case is certainly an indication, too, of the sincere conviction we have that our case is just, and is not to be given up.

We realize that the Commission is concerned with many cases, not all of which they can find the time to investigate thoroughly and to understand in detail as they are understood by the interested parties to each separate case. This letter is not to add any evidence that has not already been presented by us in various ways, but is intended to point out the important evidence that will be found explained in greater detail when our petition and communications are carefully read and considered.

Following is a list of the communications we refer to:

| | |
|---|---|
| March 12, 1957 | —Original Petition |
| June 3, 4, 10, 1957 | —Supplement to Original Petition |
| July 7, 1958 | —Reply to Attorney Examiner's Report |
| February 19, 1959 | —Reply to Order of Commission dated Feb. 2, 1959 |
| March 2, 1959 | —Letter accompanying Application for Rehearing |
| March 2, 1959 | —Application for Rehearing |

With reference to the laws of Ohio which we believe are intended to give relief in meritorious cases such as ours, we quote these laws by section number and content on page 5 of our letter of July 7, 1958.

On page 4 of our letter of July 7, 1958, in support of our claim of the extreme unreasonableness of the cost to us for the normal use of General Telephone Company's service, we show that our telephone bill would be $22.11 per month, based on an estimated **conservative** use of the telephone in making normal calls, as the word normal is commonly understood as it relates to telephone service, into the area of our natural interest served by the Ohio Bell Telephone Company, and subject to long distance toll charges. In contrast, it is shown that the Ohio Bell Telephone Company's base rate of $3.47 per month, including federal tax (at that time—it is now $3.80) would provide us with satisfactory service in our natural area of interest, unlimited as to the number of calls or to the length of calls.

In all of the hearings I have attended, the argument the General Telephone Company has given in defense of their stand is that the petitioning families are, in fact, within their boundary line, that they

can provide us with a telephone on application, and that their rates are in accordance with lawful tariffs on file. We have never questioned these statements of fact, and it is their very truth that has made us a captive locality subject to unreasonable costs for the normal use of a telephone, and has caused us to seek relief from a situation so unjust.

Out of our knowledge of the territory in question, we have suggested a new, natural boundary line following an established state highway and establish county roads which we have designated by name, and which will provide the solution to our telephone problem.

We have proved ourselves—within or immediately adjacent to the suggested new boundary line—to be a distinct. cohesive locality consisting of 27 families, with only 2 families dissenting from the purpose of our petition. We have proved beyond question that our natural area of interest is almost exclusively in the area served by the Ohio Bell Telephone Company. This proof is furnished by an exhibit in the file of our case which lists the many and various points of potential telephone communication in Ohio Bell's territory with which we would have occasion to communicate and which would account for practically all of our normal calls. Also in the file are communications from various reputable organizations and individuals, including the superintendent of our schools, giving support to our claims.

We prove that the area of the Knoxville Exchange of the General Telephone Company is almost completely alien to our natural interests and, it is to be **particularly noted**, provides for the petitioning families, in our separate and distinct locality, practically **no option** of the services and contacts which the petitioning families conveniently find in the nearby exchanges of the Ohio Bell Telephone Company.

Among the exhibits pertaining to our case are maps of the exchanges involved. I call your particular attention to a large map which was accepted as an addition to the file at our rehearing on July 24. This is a true map showing the Knoxville Exchange of the General Telephone Company and the Wellsville Exchange of the Ohio Bell Telephone Company as they join each other, and as they relate to adjacent urban districts. I had this map prepared for the purpose of showing clearly the naturalness of our claimed community of interest with the area served by the Wellsville Exchange of the Ohio Bell Telephone Company, and to show that the separate and distinct locality in which the petitioners reside is a very small part of the Knoxville Exchange of the General Telephone Company. You will note that the state highway and county roads we suggest as a new boundary line naturally draw the petitioning families into the area served by Ohio Bell's Wellsville Exchange, where our schools and practically all other natural interests are to be found.

The boundary line which now restricts us was originally the outer limits of the farmland of a few of the farmers who made up the old Knoxville Telephone Company. The territory in question was then practically open farmland without inhabitants, except for the few older landowning farmers, and was therefore without anybody to protest the concurrence in boundary lines between the (then) old Knoxville Tele-

phone Company and the Ohio Bell Telephone Company. Since that time the original landowners have sold various parcels of their land to non-farming families who have built homes and established themselves as the inhabitants of a distinct, well defined, cohesive locality. It is proved beyond question that practically all of the interests of the overwhelming majority of these families are in the area served by the Wellsville Exchange of the Ohio Bell Telephone Company, and it is the overwhelming majority of the families residing in this distinct locality, with only 2 dissenting families, who are now petitioning for a recognition of their legitimate rights.

We respectfully ask that you take **particular notice** of the fact that the area of the Knoxville Exchange of the General Telephone Company is, in itself, an almost completely barren area insofar as we are vitally concerned with the existence in it of the various services all families depend on in their daily lives. Except for a few small country stores and filling stations, there are no services to be found. In recognition and acknowledgment of the almost complete barrenness of the Knoxville Exchange of the General Telephone Company with regard to services of almost every kind, the local calling area of the Knoxville Exchange is extended to the Toronto Exchange of the Ohio Bell Telephone Company. That is all very well and good, and answers the need of the great majority of Knoxville Exchange subscribers who live in the greater area of the Knoxville Exchange and have their interests in the urban district of Toronto, Ohio. But we, the petitioning families, are distinct and apart, in our geographic situation and in our natural interests, from the greater area of the Knoxville Exchange and from Toronto, Ohio, and for that reason a local calling area including Ohio Bell's Toronto Exchange is of practically no value to us.

It certainly cannot be questioned that we, the petitioning families, in our separate and distinct locality, are just as deserving of a local calling area that would include the urban district on which we are almost entirely dependent for our vital services and telephone contacts. That urban district for us is unquestionably in the local calling area of the Wellsville Exchange of the Ohio Bell Telephone Company, as is clearly shown by the evidence we have submitted.

Almost without exception, the families residing in the distinct locality designated in our petitions are not farmers, but are dependent for their livelihood on wages earned in outside employment. With no exceptions, not one of these wage earners has his place of employment in the area of the Knoxville Exchange of the General Telephone Company, but are employed, instead, in the area of the exchanges of the Ohio Bell Telephone Company.

An order of the Commission dated February 2, 1959, required the General Telephone Company of Ohio to conduct studies to determine the volume of message toll traffic originating in the New Knoxville Exchange area of the General Telephone Company and terminating in the Salineville, Wellsville and East Liverpool Exchanges of the Ohio Bell Telephone Company. The resulting report showed that only a small percentage of the total number of subscribers in the Knoxville Exchange placed toll calls into the Salineville, Wellsville and East Liver-

pool Exchanges of the Ohio Bell Telephone Company, and it is very probable that most of these calls were placed by the few families in our distinct locality who are General Telephone Company subscribers. These figures give support to our claim that the great majority of the subscribers in the greater area of the Knoxville Exchange do not find their interests in the above named Ohio Bell Exchanges but, instead, turn to the Ohio Bell's Toronto Exchange, where their urban interests are acknowledged by including Ohio Bell's Toronto Exchange in their local calling area. Although it would not have materially affected the result, on account of the deterrent of toll charges, it should be noted that the petitioning families do not have telephones and did not participate in the above-mentioned study.

The Public Utilities Commission of Ohio is a creature of statute and as such has only the jurisdiction that is specifically conferred upon it by the Laws of the State of Ohio.

The 100th Session of the Ohio General Assembly enacted certain legislation dealing with telephone service. This legislation is commonly known as the Henderson Act and is the only statutory authority which outlines the circumstances under which The Public Utilities Commission of Ohio is empowered to order one telephone company to render service in an area currently being served by another telephone company. A study of this legislation will reveal that it was most carefully drawn in an attempt to safeguard the authority it delegated to the Commission, with an apparent recognition of outstanding court decisions and recognition of the property and procedural due process clauses of the State and Federal Constitutions. The Henderson Act is embodied in §§4905.241 through 4905.244 R. C.

Pursuant to the provisions of Revised Session Order No. 48, telephone companies operating in the State of Ohio have on file with this Commission detailed telephone exchange boundary maps which set forth and define those areas which Ohio telephone companies will serve. The filing of such an exchange boundary map is tantamount to a "holding out" to render telephone service to citizens residing within such mapped areas.

Nearly all telephone exchange boundary lines as now set out on Exchange Boundary maps tend to be historic in nature. The boundary line between the Knoxville Exchange of the General Telephone Company and the Wellsville Exchange of the Ohio Bell Telephone Company is not only a boundary line dividing telephone exchange areas, but it is also a boundary line delineating the territory of two different telephone companies.

Once a telephone company has established company boundaries under the provisions of Ohio Law and under the rules and regulations of this Commission, so long as such company is ready, willing, and able to render reasonably adequate telephone service to subscribers residing within such area the Commission does not have authority to compel a change of telephone company boundaries by removing a portion of the territory being served by one telephone company and placing it in the operating area of another telephone company. Public Utilities Com-

missions attempting to do so have been reversed by the courts. Nicona Park Telephone Company et al v. State et al, 198 Okla. 441, 180 P. 2d, 626, PUR NS 521.

By the filing of the Knoxville Exchange boundary map the General Telephone Company, or its predecessors in interest, acquired what is tantamount to a prima facie right to render telephone service to citizens residing within the Knoxville Exchange Area. The Petitioners do not dispute that they, in fact, are located within the Knoxville Exchange Area. The General Telephone Company of Ohio has, therefore, what is tantamount to an exclusive operating right within the Knoxville Exchange Area so long as they are ready, willing and able to extend their facilities to serve applicants residing within the confines of the Knoxville Exchange Area. Commensurate with the General Telephone Company's exclusive operating right, it has a corresponding duty to furnish adequate telephone service to its subscribers within the meaning of the law and the standards prescribed by this Commission. Generally speaking, competition among telephone companies in given geographic areas is obsolete. The public policy, with reference to telephone utilities, will protect a telephone company's actual operating area from infringement or encroachment by any other telephone utility so long as such telephone company serving the area remains ready, willing, and able to furnish reasonably adequate telephone service throughout the area it in fact serves. Consequently, unless a telephone company is willing voluntarily, to cede a portion of its territory, or unless a company is either unwilling or unable to furnish reasonably adequate telephone service within its actual operating area, then an infringement of a telephone company's boundary raises constitutional questions, including the possible taking of property without due process of Law.

Compelling the establishment of a "joint service area" in the Knoxville Exchange Area would also be unlawful where the General Telephone Company of Ohio stands ready, willing, and able to furnish reasonably adequate telephone service throughout the entire Knoxville Exchange Area.

The Commission in its Order dated February 2, 1959, herein required the General Telephone Company of Ohio to "conduct a study on the volume of message toll traffic originating in the Knoxville Exchange Area and terminating in the Salineville, Wellsville, and East Liverpool" exchange areas. The report of the General Telephone Company of Ohio showed that during the study period from January 5, 1959, through February 4, 1959, the volume of message toll telephone traffic originating in Knoxville averaged only .027 calls per subscriber to Salineville; only .747 calls per subscriber to Wellsville; and only .129 calls per subscriber to East Liverpool. These studies clearly indicate that there does not exist a sufficient community of interest in the Knoxville Exchange Area as a whole to warrant the institution of "extended area service" between the Knoxville Exchange Area and The Ohio Bell Exchange Areas studied

Extended area service is not a substitute for message toll service but rather a service designed to meet the day to day local calling requirements of a majority of the subscribers within their home exchange area

which cannot be met with local service confined to a single exchange. In considering the community of interest between exchanges, the volume of the message toll telephone traffic between the exchanges involved should be measured. A calling rate of 1 or 2 messages per main station per month from the home exchange to other exchange areas does not indicate a strong community of interest; however, if the calling rate were 4 to 5 calls per main station per month, it would indicate and would be evidence of a present and existing calling requirement. The above referred to study indicates the lack of a sufficiently strong community of interest of the Knoxville Exchange Area as a whole with any of the studied Ohio Bell Exchanges to warrant the institution of extended area service.

It, therefore, follows that the failure of the General Telephone Company of Ohio to provide extended area service from its Knoxville Exchange to Salineville, Wellsville, or East Liverpool Exchange Areas (and therefore to Mr. Paisley and others) does not constitute an unwillingness to provide reasonably adequate telephone service to either the complainants or its other Knoxville Exchange subscribers, since the Knoxville subscriber group as a whole do not have a sufficient calling requirement to warrant the institution of such service.

In promulgating its Order in respect to the instant complaint, all factors have been given careful consideration by this Commission. The Attorney-Examiner's written Reports have been carefully considered, as well as the studies made by the General Telephone Company of Ohio as to the determination of the volume of message toll traffic originating in the Knoxville Exchange Area and terminating in the Salineville, Wellsville and East Liverpool Exchanges of the Ohio Bell Telephone Company with an accompanying breakdown of subscriber calling rates. The Commission has also carefully considered all factors and statements contained in the brief filed by Petitioner James O. Paisley in support of Petitioners' position. All factors which are pertinent to the instant matter have been carefully reviewed and studied.

After a careful consideration of the instant matter, it is the opinion of this Commission that the Order of February 2, 1959, previously issued should be affirmed.

**FINDINGS:**

The Commission hereby adopts as its own, as if fully rewritten herein, the "Finding" as the same is contained in the written Report of the said Attorney-Examiner, dated February 15, 1960.

The Commission further finds that no Exceptions have been filed to the written Report of the said Attorney-Examiner, dated February 15, 1960, as provided by Rule 18 of the Rules of Practice before this Commission.

The Commission further finds that the written Report of the said Attorney Examiner, dated February 15, 1960, should be adopted to the extent set forth in this Order.

**ORDER:**

It is, therefore,

ORDERED, That the Written Report of the said Attorney-Examiner,

dated February 15, 1960, be, and the same is hereby adopted.
It is, further,

ORDERED, That the Commission's Order of February 2, 1959, be, and the same is hereby affirmed.

THE PUBLIC UTILITIES COMMISSION OF OHIO

Entered in the Journal:

A true copy:

R. Martin Galvin

R. Martin Galvin, Secretary.

Edward J. Kenealy

Chairman

Frances McGovern

Everett H. Krueger, Jr.

Commissioners